<u>NOT FOR PUBLICATION</u>                    [Dkt. Ent. 34]

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW JERSEY**

**CAMDEN VICINAGE**

| | |
|---|---|
| FRANK JACKSON,<br><br>             Plaintiff,<br>   v.<br><br><br>AMERICAN WATER WORKS COMPANY, INC., and AMERICAN WATER WORKS SERVICE COMPANY, INC.,<br><br>             Defendants. | Civil No. 10-3885 (RMB/JS)<br><br><br>**OPINION** |

Stephen G. Console, Esq.
Laura C. Mattiacci, Esq.
Console Law Offices, LLC
1525 Locust Street, 9th Floor
Philadelphia, PA 19102

Caren Nancy Gurmankin, Esq.
Console Law Offices
110 Marter Avenue, Suite 105
Moorestown, New Jersey 08057

      Attorneys for Plaintiff

Evan J. Shenkman, Esq.
Theresa Donahue Egler, Esq.
Ryan Todd Warden, Esq.
Ogletree, Deakins, Nash, Smoak & Stewart, PC
10 Madison Avenue, Suite 400
Morristown, New Jersey 07960

      Attorneys for Defendants

1

**BUMB**, United States District Judge:

Plaintiff Frank Jackson alleges that his current employer, American Water Works Company, Inc. ("AWWC"), and its related company, American Water Works Service Company, Inc. ("AWWSC", collectively "Defendants"), discriminated and retaliated against him in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. ("ADEA") and the New Jersey Law Against Discrimination, N.J. Stat. Ann. § 10:5-1 et seq. ("NJLAD"). Defendants now move for summary judgment as to all claims. For the reasons that follow, the Court grants this motion, in part, and denies it, in part.

## I. BACKGROUND[1]

Plaintiff's date of birth is December 31, 1953. AWWC hired him on August 31, 2004, to serve as Director of Human Resources ("HR") for Customer and Shared Business Services, a director-level position at its Voorhees, New Jersey headquarters. In this position, Plaintiff was responsible for all HR activities that related to the customer service center, the Information Technology ("IT") department, the shared business service

---

[1] All background facts are drawn from the affidavits and depositions submitted by the parties, as well as their Statements of Material Fact (under Local Rule 56.1), and are construed in the light most favorable to Plaintiff. See Kopec v. Tate, 361 F.3d 772, 775 (3d Cir. 2004), cert. den'd, 543 U.S. 956 (2004).

center, AWWC's labs in Belleville, Illinois, and its supply
chain group.

In 2006, Plaintiff accepted a transfer to the position of
Director of HR Systems and Processes, also a director-level
position located at company headquarters in Voorhees, at the
request of James Mulski, then Vice President of HR.  In this new
position, Plaintiff's job responsibilities differed from his
previous position in that it focused more on upgrading and
defining the HR systems and processes in a way that they could
be consistently administered.  Plaintiff retained his prior
responsibilities for supporting the IT group with respect to
employee relations and benefits issues.

In December 2007, AWWSC hired Sean Burke (age 52) as Senior
Vice President of Human Resources.  His date of birth is July
14, 1955.  Burke became Plaintiff's immediate manager.  Shortly
after Burke was hired, Burke told him that he had evaluated
Plaintiff's position and did not think it warranted the grade
level at which it was classified; he also told Plaintiff he did
not value the work that Plaintiff was doing in his current
position.  After their initial discussion, Burke reiterated to
Plaintiff in subsequent conversations that his responsibilities
did not justify the pay level, and he encouraged Plaintiff to
seek other positions within the company.

**1. The Business Transformation Project (Fall 2008)**

3

In 2008, Defendants launched a new initiative called the "Business Transformation Project" ("BT Project"), which involved replacing and updating all business processes and systems.[2]  John Young (age 55), the President and Chief Water Technology Officer of AWWSC, was named executive sponsor for the new initiative and was responsible for overseeing it.  Young's date of birth is September 27, 1953.

In October 2008, Young asked Andrew Twadelle (age 50), the Vice President of Audit, to take on the role of BT Vice President and to serve as the day-to-day leader of the BT Project.  Twadelle's date of birth is December 30, 1957.  As VP of the BT Project, it was Twadelle's responsibility, with the approval of Young, to put together a leadership team to represent six core processes within the company - (1) finance, (2) purchasing, (3) human resources, (4) field service activities, (5) capital engineering field activities, and (6) billing and correction.  Twadelle and Young then identified "Process Leads" for each of the six core processes, with input from the heads of the business in these core process areas.

### HR Process Lead Position

---

[2] Defendants state that the "Company" launched this initiative but do not specify whether they refer to AWWC, AWWSC, or both. This distinction appears to be immaterial, so the Court simply proceeds as though the Defendants collectively launched the initiative.  Consistent with the parties' briefs, the Court uses "company" and "Defendants" interchangeably throughout the opinion.

Burke nominated Plaintiff for the HR Process Lead position in the summer or fall of 2008, given his knowledge and capability around IT systems and the fact that he was not "fully challenged" in his current position.  (Burke Dep. 136:8-137:5, 137:21-138:14, Pl.'s Ex. H.)  Burke recalled telling Plaintiff at the time that he had nominated him for the position. (Id. at 138:24-139:2.)  Plaintiff testified, however, that Burke told him he would assume the role of HR Process Lead when the BT Project was launched.  (Pl.'s Dep. 55:1-22, Pl.'s Ex. A.) According to Plaintiff, Burke also made comments to this effect at staff meetings.  (Id.)

According to Twadelle, Burke recommended Plaintiff for the position, because of his "systems background", with the view that this was a "systems job."  (Twadelle Dep. 31:22-33:3, Def.'s Ex. F.)  Twadelle and Young, however, felt that the position required field experience and a background in "business process" as opposed to systems. (Id.; Young Dep. 33:3-35:23, Pl.'s Ex. C.)  According to Young, they sought someone "who was really focused on the process side," as opposed to Plaintiff, who had more of a background in technology, policy, and procedure.  (Young Dep. 33:3-35:23.)  Young testified that they wanted someone with knowledge of the call center, "how the business was done out in the field," and "how it was done centrally", who was respected throughout the organization,

worked well with people, and could build consensus.  (Id. at
33:8-19.)  Young testified that the HR Process Lead needed to be
accountable for the business transformation process and champion
the project after its completion in three to five years.  (Id.
at 33:19-34:16.)  Twadelle initially anticipated that the
implementation of the BT project would last until approximately
2014.  Young testified that he had had some experience with
Plaintiff in the call center and believed he was not the best
person to build consensus, given his reputation for being heavy-
handed.  (Id. at 36:7-23.)

### *Plaintiff's Florida Home*

According to Defendants, Plaintiff's colleagues had the
impression he was contemplating retirement.  In 2007, Plaintiff
and his wife purchased a vacation home in Estero, Florida, where
he believed he might eventually retire.  (Pl.'s Dep. 12:7-
13:17.)  Plaintiff had a picture of his Florida home as his
screensaver.  One of Plaintiff's colleagues, John Romeo,
testified that Plaintiff showed him pictures of his Florida home
and expressed on several occasions that he was looking forward
to retiring there.  (Romeo Dep. 110:1-10, Def.'s Ex. I.)
Romeo's impression from these encounters was that Plaintiff
planned to retire within "a couple years."  (Id. at 110:16-17.)
Plaintiff also showed Young pictures of his Florida home and
mentioned that he had recently purchased it and that his wife

was spending a lot of time down there.  (Young Dep. 77:13-24, Pl.'s Ex. C.)  Plaintiff never discussed retirement plans with him or a timeline for when he might retire, but their conversation about Plaintiff's Florida home led Young to believe that Plaintiff was "thinking about" retirement.  (Id.)  Young had not heard from anyone in the company that Plaintiff had plans to retire, however.  (Id. at 78:5-9.)  In fact, Plaintiff never discussed his retirement plans with anyone at work. (Pl.'s Dep. 85:4-11, Pl.'s Ex. A.)

### *Kimberlee Legg Hired (October 2008)*

Twadelle testified that despite Burke's nomination of Plaintiff for the HR Process Lead position, he ultimately selected Kimberlee Legg (age 51), an existing HR professional within the company.  (Twadelle Dep. 27:5-9, Def.'s Ex. F.) Legg's date of birth is May 31, 1957.  She is three and a half years younger than Plaintiff.  Twadelle offered Legg the position in mid-October of 2008.  (Legg Dep. 60:12-18, 66:22-67:1, Warden Suppl. Decl. Ex. B.)

Twadelle testified that he selected her as the HR Process Lead, given her field experience and other attributes.[3]

---

[3] Twadelle testified in relevant part:

> Well, I was focused on Kim Legg, so it wasn't a competition or a comparative.  It was I wanted somebody who had field experience that had a good general understanding, that she also happened to have call center experience, which has a number of HR processes and significant number of employees.

(Twadelle Dep. at 29:7, 32:3-4.)  He had previously worked with her and believed she was "very professional", a "strong generalist" who "communicated well," had "good interpersonal skills," and a "good understanding of the field operations." (Id. at 20:10-14.)

Plaintiff testified that Legg was the "only other logical choice" besides him for the job.  (Pl.'s Dep. 96:10-12, Def.'s Ex. C.)  Management had designated her as a "high potential person".  (Id. at 107:18-19.)  Plaintiff testified that to his knowledge, he had not received such a designation, although he noted that he would not necessarily be told if he had been so designated.  (Id. at 108:22-109:13.)  Throughout his tenure at AWWC, he received an overall performance rating of "Meets Expectations", which is one step below the highest rating of "Exceeds Expectations" and above two lower levels entitled "Progressing" and "Does Not Meet Expectations".  (Pl.'s Ex. F.)

### Allegedly "Ageist" Comments (September-October 2008)

Plaintiff has identified four allegedly "ageist" comments, which were made to him during the selection of the HR Process Lead position.  First, prior to the selection of Legg as HR Process Lead, Plaintiff had a conversation with Young, in which

---

And she had the right demeanor, professionalism, communication skills, interaction skills.  And she wasn't concerned about who is going to do the work.  She was willing to do the work.
(Twadelle Dep. 29:5-15.)

Young told him that the company needed process leads for the BT "who did not look like him, [Plaintiff], or Bob Sievers." (Pl.'s Dep. 51:12-18, Def.'s Ex. C.)

Second, Young sent Plaintiff an email, dated September 4, 2008, in which he stated that it was important that at least one of the BT Process Leads have enough "longevity left in the business to show the team will be accountable for the longer term impact of their product." (Def.'s Ex. H; Pl.'s Dep. 112:19-22.) This email was sent in response to an email from Plaintiff with the subject line "Co-Leads." (Id.) In Plaintiff's email, he asked Young several questions, including how he defined "co-lead" and whether this meant both positions would be equal in responsibility, decision-making, and accountability. Specifically, Plaintiff stated:

> The reason for these questions is that Bob and I have over 30 years of experience. Whomever we choose, will not have anything close to that. <u>If we are really talking about a lieutenant who will be groomed to take over after the [sic] Bob and I would leave, that is different.</u> In that case co-lead is a misnomer.

(Pl.'s Ex. H, emphasis added.)

Third, Plaintiff alleges that on October 13, 2008, Emily Ashworth, Vice President and Chief Information Officer, announced to her group on a conference call that Plaintiff would not be the HR Process Lead because he did not have enough "longevity". (Am. Compl. ¶ 25; Pl.'s Dep. 113:5-10.) A day or

two later, Ashworth apologized to Plaintiff "for the way that the comment came off" and explained that the BT Process Lead was expected to stay with the company for five to seven years. (Pl.'s Dep. 84:19-85:3.)

Fourth, Plaintiff alleges that on October 9, 2008, Steve Schmitt, Vice President of Operations, told Plaintiff that he was having difficulty selecting a BT Process Lead for Operations because all of his team members were "older". (Pl.'s Dep. 112:23-113:4; Am. Compl. ¶ 24.)

### Plaintiff's Complaints of Age Discrimination (October 2008)

On October 14, 2008, Plaintiff told John Romeo, the Chief Ethics Compliance Officer, and Melanie Kennedy, an Associate Labor and Employment Counselor, that Ashworth had told him he would not be named to HR Process Lead for the BT because he did not have sufficient "longevity." (Am. Compl. ¶¶ 25-27; Pl.'s Dep. 261.) Romeo responded, "that's not good," and Plaintiff replied, "you are right, it's not." (Pl.'s Dep. 262:17-23.) Plaintiff expected Romeo to investigate the comments, although he admits that he did not ask for an investigation. (Pl.'s Dep. 262:24-263:7.) Romeo testified that when Plaintiff mentioned the "longevity" comment, he was laughing and joking, and Romeo did not believe it was "outside the norm of a normal conversation that we would have." (Romeo Dep. 60:9-21, Def.'s Ex. I.) Romeo claims he did not investigate the comment because

10

Plaintiff did not bring a complaint, so he had nothing to investigate.  (Id. at 64:18-21.)  Romeo testified that he told Plaintiff "you need to tell me if you're joking around about this or if you're bringing a complaint.  Because if you're bringing a complaint, you know what my rule is."  (Id. at 64:6-10.)  According to Romeo, Plaintiff replied, "No, John.  I'm not bringing a complaint.  If I'm ever going to complaint about something, I would let you know."  (Id. at 64:11-13.)  Plaintiff denies this exchange, and given summary judgment posture, the Court credits Plaintiff's version of the facts.  (Pl.'s Dep. 268:24-269:5.)

On October 15, 2008, Plaintiff told Burke that he thought he would be hired as HR Process Lead but was informed by Ashworth that he did not have enough "longevity" for this position.  (Pl.'s Dep. 275:12-18.)  Burke denied having this conversation.  (PSMF 46; Def.'s Resp. to PSMF ¶ 46.)  The Court again credits Plaintiff's account, as it must.

## 2. HR Director Positions for Customer Service & Eastern Division (February 2009)

In December 2008, two HR director-level positions became available at the Customer Service Center in Alton, Illinois, and at the Eastern Division in Lexington, Kentucky.  Burke represented to Plaintiff that he need only express an interest in these jobs and Burke would "get something done" for him,

11

which Plaintiff took to mean that he could have either job if he
wanted it.  (Pl.'s Dep. 167:4-9, 168:16-20.)  Plaintiff
expressed an interest in both positions to Burke, believing
based on their conversation that a formal application was
unnecessary.  (Id. at 157:12-14.)  Burke informed him that he
would need to relocate to Kentucky for the HR Director position
for the Eastern Division, and Plaintiff stated that he was
unable to relocate but was willing to commute on a weekly basis
from his residence in Pennsylvania.  (Id. at 155:8-20.)  Burke
testified that Plaintiff was not considered for either of these
two positions because although they were posted, Plaintiff did
not nominate himself for consideration.  (Burke Dep. 191:10-14,
Pl.'s Ex. H.)  Burke also testified that he had conversations
with the people who were hiring for these two posts but did not
recommend Plaintiff because he did not know that Plaintiff was
willing to perform either job full-time in their respective
locations.  (Id. at 191:10-23.)

        In February 2009, Defendants announced their selection of
Tracie Beckwith for the HR Director position for the Customer
Service Center in Alton, Illinois, and Kurtis Strauel as HR
Director for the Eastern Division.  Both relocated to take the
jobs.

### 3. Director of Employee Relations Position (February 2009)

In February 2009, Burke discussed with Plaintiff the
possibility of splitting the responsibilities of the Director of
Employee and Labor Relations position and creating a new
position to handle employee relations.

### 4. HR Director Position for New Jersey American Water (March 2010)

On March 10, 2010, Defendants posted the position of
Director of HR for New Jersey American Water ("NJAW").  Shortly
thereafter, Plaintiff applied for the job.  Burke and John
Bigelow (age 55), the President of NJAW, made the hiring
decision for this position.  (Bigelow Dep. 5:9-15, Pl.'s Ex. I.)
Bigelow's date of birth is October 26, 1954, so he is less than
a year younger than Plaintiff.  At Burke's recommendation,
Bigelow interviewed both Plaintiff and Trudy Spence-Parker (age
53) for the job.  Spence-Parker had been serving as Director of
HR for American Water Enterprises ("AWE").  Her date of birth is
July 18, 1956, so she is approximately two and a half years
younger than Plaintiff.  Bigelow testified that after consulting
with Burke, he decided to promote Spence-Parker to the position
over Plaintiff, based on his interviews with both and his prior
interactions with Plaintiff.  See infra Part III.B.4.

### 5. Plaintiff's Demotion and the Pre-Separation Agreement (January 2010)

In December 2009, Burke informed Plaintiff that his
position as Director of HR Systems and Processes would be
eliminated and he would transition to a lower-level position in
the BT Project.  (Pl.'s Dep. 121-23.)  Jerry Crofford (age 55),
Director of Talent Management, who Plaintiff admits is an age
peer, assumed Plaintiff's responsibilities for the IT group.
(Pl.'s Dep. 185:15-186:3.)  Crofford's date of birth is
September 23, 1954.  Defendants presented Plaintiff with a Pre-
Separation Agreement ("Agreement") in January 2010, setting
forth the terms of Plaintiff's transition to the position of
Subject Matter Expert, HR Systems Upgrade for the BT, in April
2010.  See infra Part III.C.3.  In exchange for these job
assurances, pay protection, and completion bonus, the Agreement
required Plaintiff to sign a release of all claims of age
discrimination against the Defendants.  Plaintiff advised Burke
that he was not inclined to sign the Agreement given its
requirement that he waive his right to sue Defendants for
discrimination.  (Pl.'s Dep. 124:14-125:4.) Plaintiff ultimately
decided not to enter into the Agreement.

Plaintiff was reassigned to duties supporting the BT in
April 2010, reporting to Legg.  Although he had not signed the
Agreement, he was given some of the benefits it provided:  Burke
maintained his director-level pay and benefits, his eligibility
for a merit increase and his eligibility for an annual incentive

14

plan.  Also consistent with the terms of the Agreement,
Defendants removed him from his participation in the long-term
incentive plan and reduced his grade by two levels.  Plaintiff
was advised that Defendants would evaluate potential
opportunities for him in the newly transformed HR function upon
the elimination of his position at the end of 2012.  The vast
majority of employees assigned to the BT were similarly told
that their positions would be eliminated after implementation of
the BT and that they would be considered for any open positions
at that time.

     Plaintiff's attorney sent a letter, dated February 2, 2010,
to Kennedy in her then-role as Labor and Employment Counsel.
(Def.'s Ex. V.)  This letter alleged that Plaintiff had been
subjected to "age-biased comments," "denied critical positions
because of his age," and that he had complained to Defendants
about such treatment.  The letter sought to determine whether
AWWC had any interest in trying to resolve these issues before
Plaintiff instituted legal action.  Kennedy contacted
Plaintiff's counsel but was able to reach a resolution on the
terms of the Agreement.

### 6. EEOC Charge (May 2010)

     Plaintiff filed a Charge of Discrimination with the Equal
Employment Opportunity Commission ("EEOC") on May 18, 2010.
(Pl.'s Ex. W.)  He alleged age discrimination and retaliation by

Defendants.  On July 30, 2010, Plaintiff initiated this lawsuit
with the filing of a complaint in this Court.

### 7. HR Director Position for AWE (July 2010)

On April 13, 2010, shortly after Spence-Parker's selection
as HR Director of NJAW, Defendants posted the position she had
vacated, HR Director for AWE.  Mark Strauss, President of AWE,
was the principal decision-maker for this job, with consultation
from James Sheridan, President of Military Services, and Sharon
Cameron, President of Homeowner Services, and the approval of
Burke.  (Strauss Dep. 83:8-14, Def.'s Ex. P.)  Strauss' date of
birth is May 3, 1951, so he was 59 at the time he made this
hiring decision.  Plaintiff applied for the position.
Defendants conducted phone interviews with approximately ten
candidates, which they whittled down to three finalists,
Plaintiff and two external candidates.  (Strauss Dep. 54:19-20,
67:13-15.)  Strauss testified that Defendants ultimately hired
Gary Harvilla (age 52) for this position on July 27, 2010.
Harvilla's date of birth is February 4, 1958, which made him
four years younger than Plaintiff.  It was unanimous among
Strauss, Sheridan, and Cameron that Harvilla was the best
candidate for the job.  (Strauss Dep. 66:19-71:15.) They relied
on the following attributes in making this decision: (1) the
fact that Harvilla had substantial experience outside of the
regulated utility company format, (2) he had shown progression

16

through the ranks of that company, (3) he had the most "change-management" experience, (4) he was professionally certified as a Black Belt Six Sigma, (5) he had gone from managing in a decentralized to a centralized format, which was important because Defendants were going through a transformation to make their HR systems more centralized, (6) he was the best fit in terms of personal interactions and chemistry, (7) he had the most significant union avoidance experience, and (8) he had the most experience with geographic diversity, dealing with both represented and non-represented workers. (DSUMF ¶ 92; Pl.'s Resp. ¶ 92.)  Plaintiff conceded that he did not know whether he was more qualified than Harvilla for the position. (Pl.'s Dep. 229:24-230:3.)

In addition, Strauss testified that his decision was influenced by lackluster feedback about Plaintiff from Emily Ashworth, Chief Information Officer, whose IT group had previously been supported by Plaintiff, and Carole Dascani, Plaintiff's former supervisor. (Strauss Dep. 72:13-24, 75:14-21.)  Ashworth told him that if the subject matter interested Plaintiff, he would do good work, but if it did not engage him, it was very difficult to get him to perform and to do so in a timely fashion. (Id. at 72:17-24.)  When asked what she thought of Plaintiff's work, Dascani told Strauss that he would have to

form his own opinion on the matter, a response, which Strauss found "odd".  (Id. at 75:14-21.)

After the hiring decision had been made, Plaintiff spoke with Strauss, who told him that he was "a very strong candidate" but "there were some things that he was looking for that he thought [Plaintiff] didn't have."  (Pl.'s Dep. 181:7-11.) Plaintiff could only recall two specific examples cited by Strauss - knowledge of Six Sigma and large company experience. (Id. at 181:16-182:1.)  Plaintiff told Strauss that he did have knowledge of Six Sigma and large company experience, but Strauss informed him that the decision had already been made. (Id. at 182:6-14.)  According to Strauss, he gave Plaintiff a "couple of examples" as to why he chose Harvilla for the position, and Plaintiff responded that he had Six Sigma and big company experience, too.  (Strauss Dep. 89:16-22, Pl.'s Ex. K.)  Strauss "acknowledged that" and responded "I'm not saying you were unqualified.  I'm just saying at the end of the day I made the call I thought Gary was the most qualified."  (Id. at 89:23-90:2.)

**8. HR Director Position for Corporate Services (January 2011)**

In January 2011, the position of Director of HR for Corporate Services was posted, and Plaintiff applied for it. Burke made the decision to hire Melanie Kennedy (age 37) for this position.  (Burke Dep. 311:6-10.)  Kennedy's date of birth

is May 10, 1973.  (Kennedy Dep. 4:6-7, Pl.'s Ex. KK.)  Burke testified that he did not hire Plaintiff, because the IT group was one of the key internal clients that would be supported by this position and Burke knew that Ashworth (Chief Information Officer) had worked with Plaintiff in the past and had not been satisfied with his support.  (Burke Dep. 311:12-16.)  <u>See</u> <u>infra</u> Part III.B.6.

## II. STANDARD

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).[4]  A fact is "material" if it will "affect the outcome of the suit under the governing law . . . ."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  A dispute is "genuine" if it could lead a "reasonable jury [to] return a verdict for the nonmoving party."  <u>Id.</u> at 248.

When deciding the existence of a genuine dispute of material fact, a court's role is not to weigh the evidence: all reasonable "inferences, doubts, and issues of credibility should be resolved against the moving party."  <u>Meyer v. Riegel Products</u>

---

[4] Pursuant to amendments to the Federal Rules of Civil Procedure in December 2010, the oft-cited summary judgment standard is now located in Rule 56(a) rather than 56(c).  Although the wording of the standard has changed slightly, replacing the word "issue" with "dispute", this change does not affect the substantive standard or the applicability of prior decisions construing the standard.  Fed. R. Civ. P. 56(a) advisory committee's note.

Corp., 720 F.2d 303, 307 n.2 (3d Cir. 1983).  However, a mere "scintilla of evidence," without more, will not give rise to a genuine dispute for trial.  Anderson, 477 U.S. at 252.  In the face of such evidence, summary judgment is still appropriate "where the record . . . could not lead a rational trier of fact to find for the non-moving party . . . ."  Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). "Summary judgment motions thus require judges to 'assess how one-sided evidence is, or what a 'fair-minded' jury could 'reasonably' decide.'"  Williams v. Borough of West Chester, Pa., 891 F.2d 458, 460 (3d Cir. 1989) (quoting Anderson, 477 U.S. at 265).

     The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  Then, "when a properly supported motion for summary judgment [has been] made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'"  Anderson, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)).  The non-movant's burden is rigorous: it "must point to

concrete evidence in the record"; mere allegations, conclusions, conjecture, and speculation will not defeat summary judgment. Orsatti v. New Jersey State Police, 71 F.3d 480, 484 (3d Cir. 1995); Acumed LLC v. Advanced Surgical Servs., Inc., 561 F.3d 199, 228 (3d Cir. 2009) ("[S]peculation and conjecture may not defeat summary judgment.").

### III. ANALYSIS

#### A. Statute of Limitations & Administrative Exhaustion of ADEA Claims

Defendants argue that several of Plaintiff's ADEA claims are untimely and therefore barred.  Plaintiff does not dispute this.  In order to maintain an action under the ADEA in New Jersey, a plaintiff is required to file a charge with the EEOC within 300 days of the allegedly unlawful practice.  29 U.S.C. § 626(d)(1)(B); Snyder v. Baxter Healthcare, Inc., 393 F. App'x 905, 908 (3d Cir. 2010); Evans v. Port Auth. Trans-Hudson, Corp., Civ. No. 04-4062, 2006 WL 408391, *3 (3d Cir. Feb. 23, 2006) ("Prospective employment discrimination plaintiffs have 300 days to file a charge with the EEOC in states that have a procedure for conciliation by state agencies, and 180 days to file if the allegedly discriminatory act took place in a state without such a parallel mechanism.  New Jersey falls within the former category.").  The parties do not dispute that each of Plaintiff's claims for demotion and failure-to-hire or transfer

is a discrete employment action.  The applicable statute of limitations thus began to run from the date that each action allegedly occurred.  Morgan v. Nat'l R.R. Passenger Corp., 536 U.S. 101, 111 (2002) ("A discrete retaliatory or discriminatory act 'occurred' on the day that it 'happened.'  A party, therefore, must file a charge within 180 or 300 days of the date of the act or lose the ability to recover for it.").  Plaintiff filed his EEOC Charge of Discrimination ("Charge") on May 18, 2010.  (Pl.'s Ex. 1 to Am. Compl., Dkt. Ent. 26-1.)  Thus, his federal discrimination claims are limited to those incidents that occurred during the 300-day period between July 22, 2009, and May 18, 2010.

Defendants also contend that Plaintiff is barred from bringing ADEA claims that arose after he filed his EEOC Charge on May 18, 2010, because he did not amend his Charge or file an additional Charge to put the EEOC on notice of these claims. Plaintiff did not dispute this point and has apparently conceded it.  It is well established that before bringing a federal action for a violation of the ADEA, the plaintiff must exhaust his claim by filing a timely charge with the EEOC.[5]  29 U.S.C. §

_____

[5] The Court notes, however, that it may hear claims not contained in an administrative charge where they arose during the course of the EEOC investigation or were closely related to conduct alleged in the charge, and the EEOC therefore had notice of "the full scope of the situation during its settlement efforts."  Anjelino v. N.Y. Times Co., 200 F.3d 73, 94 (3d Cir.

626(d)(1) ("No civil action may be commenced by an individual under this section until 60 days after a charge alleging unlawful discrimination has been filed with the [EEOC]."); Shahin v. Del. Dep't of Finance, 344 F. App'x 765, 766 (3d Cir. 2009) ("A complaint brought under the [ADEA] will be dismissed for failure to exhaust administrative remedies if a supporting EEOC charge was not filed within 180 or 300 days (depending on state law) of notification to the employee of the adverse employment action.") (quoting Ruehl v. Viacom, Inc., 500 F.3d 375, 382 (3d Cir. 2007)).

Accordingly, all ADEA claims arising from the adverse employment actions that occurred before July 22, 2009, are dismissed as time-barred, and all claims arising after May 18, 2010, are dismissed for failure to exhaust administrative remedies.  The remaining ADEA discrimination and retaliation claims relate to: (1) the NJAW position, which was filled in April 2010 (Am. Compl. ¶¶ 41-43), and (2) Plaintiff's demoted to the position of Human Resources Subject Matter Expert in April 2010 (Compl. ¶¶ 35-39).  The Court evaluates these remaining ADEA claims with Plaintiff's NJLAD claims.

_____

1999); see also Hsing-Chow Hwang v. U.S. Dep't of Defense, Head, Civ. No. 04-1663, 2006 WL 1084161, *4 (D.N.J. Apr. 25, 2006). By not opposing Defendants' motion, however, Plaintiff has apparently conceded that this exception to the administrative exhaustion rule has no application here.

**B. Plaintiff's Discrimination Claims**

Plaintiff alleges claims of age discrimination in violation of the NJLAD and ADEA.  New Jersey enacted the NJLAD in furtherance of the state's public policy "to eradicate invidious discrimination from the workplace."  Carmona v. Resorts Int'l Hotel, Inc., 915 A.2d 518, 528 (N.J. 2007) (quoting Craig v. Suburban Cablevision, Inc., 660 A.2d 505, 508 (N.J. 1995)).  The NJLAD makes it unlawful for an employer to refuse to hire an individual because of his age.  N.J. Stat. Ann. § 10:5-12(a). To prevail on such a claim, the plaintiff must show that age "played a role in the decision making process and that it had a determinative influence on the outcome of that process."  Bergen Comm. Bank v. Sisler, 723 A.2d 944, 953 (N.J. 1999).  Similarly, the ADEA provides a federal remedy against age discrimination in employment for people who are at least forty years of age.  29 U.S.C. §§ 623, 631(a).  Specifically, the ADEA prohibits an employer from discharging, refusing to hire, or otherwise discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a)(1).

Plaintiff's ADEA and NJLAD claims are governed by the same analysis.  Kelly v. Moser, Patterson, & Sheridan, LLP, 348 F. App'x 746, 747 n.2 (3d Cir. 2009), cert. den'd, 130 S.Ct. 3386 (2010); Monaco v. Am. Gen. Assur. Co., 359 F.3d 296, 305 (3d

Cir. 2004), cert. den'd, 543 U.S. 814 (2004). Both claims
proceed under the familiar three-step, burden-shifting framework
established in McDonnell Douglas v. Green, 411 U.S. 792 (1973).
Dunleavy v. Mt. Olive Twp., 183 F. App'x 157, 158 (3d Cir. 2006)
(applying McDonnell-Douglas analysis to ADEA and NJLAD claims
with "slight" modification for age discrimination) (citing
Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108 & 1114
n.5 (3d Cir. 1997) (en banc)).[6]

In the ADEA context, the plaintiff at all times carries the
burden of proving "that age was the 'but-for' cause of the
challenged employer decision." Gross, 557 U.S. at 177-78.  At
the first step of the analysis, the plaintiff must establish a
prima facie case of age discrimination.  St. Mary's Honor Ctr.
V. Hicks, 509 U.S. 502, 506 (1993); Dunleavy, 183 F. App'x at
158.  If the plaintiff satisfies this burden, a presumption
arises that the employer unlawfully discriminated against him.
Id.  The employer may rebut this presumption at the second stage
of the analysis by articulating "some legitimate,

---

[6] Recently, the Supreme Court held that the burden of persuasion
in ADEA cases does not shift from plaintiff to defendant.  Gross
v. FBL Fin. Servs., Inc., 557 U.S. 167, 177-80 (2009).  Since
the McDonnell Douglas framework never shifts the burden of
persuasion to the employer, the Third Circuit has held that
Gross does not preclude its continued application in age
discrimination cases.  Smith v. City of Allentown, 589 F.3d 684,
691 (3d Cir. 2009).  Accordingly, case law applying the
McDonnell Douglas methodology to ADEA cases controls this
Court's analysis.

nondiscriminatory reason for the employee's rejection."  St. Mary's Honor, 509 U.S. at 510 n.3; Dunleavy, 183 F. App'x at 158.  Although the burden of production shifts to the employer at this second step, the ultimate burden of persuasion remains at all times with the plaintiff.  St. Mary's Honor, 509 U.S. at 506-07.  If the employer sets forth a nondiscriminatory reason for its employment decision, "the burden of production shifts once again to the employee to establish that the employer's proffered justification for the adverse action is pretextual."  Smith, 589 F.3d at 691 (citing Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254-55 (1981)).  At this third step, the plaintiff carries "the ultimate burden of persuading the court that [he] has been the victim of intentional discrimination."  Burdine, 450 U.S. at 256.  He "may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  Id. (citing McDonnell Douglas, 411 U.S. at 804-05); Ullrich v. U.S. Sec'y of Veterans Affairs, 457 F. App'x 132, 138 (3d Cir. 2012).  The Court addresses each adverse employment action in turn.

   1. **HR Process Lead Position**

      a. **Prima Facie** Case

To establish a <u>prima facie</u> case of age discrimination, a plaintiff typically must show that: (1) he is at least 40 years of age,[7] <u>see</u> 29 U.S.C. § 631(a); (2) he was qualified for the position in question; (3) despite his qualifications, he was rejected; and (4) the adverse action occurred under circumstances that could give rise to an inference of age discrimination. <u>Ullrich</u>, 457 F. App'x at 138 (citing <u>Makky v. Chertoff</u>, 541 F.3d 205, 214 (3d Cir. 2008)); <u>Rouse v. II-VI Inc.</u>, Civ. No. 06-566, 2008 WL 2914796, *13 (W.D. Pa. July 24, 2008), <u>aff'd</u>, 2009 WL 1337144 (3d Cir. 2009).  The parties here only dispute whether Plaintiff has established the fourth prong. Accordingly, the Court focuses its analysis on this issue.

In failure-to-hire cases, courts have held that the person ultimately hired by the employer must be "sufficiently younger" to permit an inference of age discrimination. <u>Narin v. Lower Merion Sch. Dist.</u>, 206 F.3d 323, 331 (3d Cir. 2000); <u>see also Hill v. Borough of Kutztown</u>, 455 F.3d 225, 247 (3d Cir. 2006). Although the Third Circuit has not established a bright-line rule, "sufficiently younger" typically means an age difference of at least five years. <u>See</u>, <u>e.g.</u>, <u>Reap v. Cont'l Casualty</u>

---

[7] The requirements to make out a <u>prima facie</u> case of age discrimination under the NJLAD are essentially the same as those required under the ADEA, except that the NJLAD is not limited to persons who are at least 40 years of age – an immaterial difference in the present case, since Plaintiff is over 40 years old. <u>Monaco</u>, 359 F.3d at 300.

Company, No. Civ. A. 99-1239, 2002 WL 1498679, * 15 (D.N.J. June 28, 2002) (collecting cases); Jehling v. Mellon Bank, Civ. No. 05-1174, 2006 WL 1508963, *6 (W.D. Pa. May 31, 2006).  The case law suggests, however, that where the age difference is less than five years, as it is here, a plaintiff may still establish an inference of age discrimination by proffering sufficient additional evidence.  See, e.g., Rouse, 2008 WL 2914796, *13 n.12 (noting that plaintiff need not show he was treated differently than someone "sufficiently younger" "if other case-specific evidence exists which tends to create an inference of age discrimination"); Burrows v. Twp. of Logan, Civ. No. 05-458J, 2008 WL 4274369, *6 (W.D. Pa. Sept. 17, 2008) (same); Jehling v. Mellon Bank, Civ. No. 05-1174, 2006 WL 1508963, *6 (W.D. Pa. May 31, 2006) (interpreting Third Circuit case law to hold that "absent other evidence", seven-year age difference would not support inference of discrimination); Fitzpatrick v. Nat'l Mobile TV, 364 F. Supp. 2d 483, 491 n.4 (M.D. Pa. 2005) (recognizing that circumstances may exist where plaintiff can demonstrate inference of discrimination even if he is replaced by "an insignificantly younger individual"); cf. Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 353-54 (3d Cir. 1999) (noting that an employee may be able to show that his protected characteristic "tipped the scales against him, without regard to the demographic characteristics of his replacement").  "The

28

touchstone of th[is] inquiry is whether the circumstances giving rise to an inference of discrimination are of <u>evidentiary value</u>, not whether they fit into a mechanical formula." <u>Rouse</u>, 2008 WL 2914796, *13 n.12 (citation omitted).

Indeed, the Third Circuit has not required a strict age difference, and it is well-settled that the elements of a <u>prima facie</u> case are not rigid. <u>Swierkiewicz v. Sorema N.A.</u>, 534 U.S. 506, 512 (2002), <u>overruled in part on other grounds</u>, <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544 (2007) (citing <u>Furnco Constr. Corp. v. Waters</u>, 438 U.S. 567, 577 (1978)); <u>Jones v. Sch. Dist. of Phila.</u>, 198 F.3d 403, 411 (3d Cir. 1999) (noting that "the elements of a <u>prima facie</u> case depend on the facts of the particular case," and thus, "a <u>prima facie</u> case cannot be established on a one-size-fits-all basis"); <u>Sarullo v. U.S. Postal Serv.</u>, 352 F.3d 789, 797-98 (3d Cir. 2003) (noting that <u>prima facie</u> elements must remain "flexible and must be tailored to fit the specific context in which it is applied").

With respect to the HR Process Lead position, Plaintiff argues that he has established an inference of age discrimination because Defendants ultimately hired Legg, the younger of the only two viable candidates for the position, and because Young, Ashworth, and Schmitt made "ageist" comments to him during the hiring process.  The Court considers each comment in turn.

29

### i. Young's comment that BT Process Leads should "not look like him"

The Court gives little weight to the first comment cited by Plaintiff - Young's statement that the company needed process leads for the BT "who did not look like him, [Plaintiff], or Bob Sievers." (Pl.'s Dep. 51:12-18, Def.'s Ex. C.)  Plaintiff assumed Young was referring to age, because he, Young, and Sievers are all approximately the same age. (Id. at 51:21-52:11.)  The record does not support Plaintiff's assumption, however, and the Court may not credit such unsupported speculation. Acumed LLC v. Advanced Surgical Servs., Inc., 561 F.3d 199, 228 (3d Cir. 2009).

Young testified that he was not referring to age but to the fact that he, Sievers, and Plaintiff had spent their entire careers as "corporate" employees. (Young Dep. 69:22-70:3, Def.'s Ex. E.)  Young testified that because the BT Process Leads involved field work, he and Twadelle felt it was "extremely important" that the Leads have field experience, something that neither he, Plaintiff, nor Sievers had.  Young explained that having a background in "the field" was important to generate respect for the project, since the company's goal was to make the BT a "bottom-up project" supported by the business, as opposed to a "top-down project" dictated by corporate. (Id. at 70:13-17.)  Young "felt that the best way to

30

do that was [to] bring people out of the business who understood the business" and he, Plaintiff, and Sievers "were not people who were coming from the business," but were "sitting at the corporate level." (Id. at 70:17-22.)  Young's detailed explanation is supported by the fact that he hired Legg for the HR Process Lead, a candidate who was close in age to Plaintiff and Young (less than four years younger than both) with considerable field experience.  Plaintiff has given the Court no reason to doubt Young's explanation.  Accordingly, it appears this comment has no relevance to age.

### ii. Young and Ashworth's "longevity" comments

Next, Plaintiff cites to Young and Ashworth's comments concerning "longevity".  In an email dated September 4, 2008, Young stated that it was important for at least one of the BT Process Leads to have enough "longevity left in the business to show the team will be accountable for the longer term impact of their product." (Def.'s Ex. H; Pl.'s Dep. 112:19-22.)  As discussed supra, Young was responding to an email from Plaintiff, which read: "If we are really talking about a lieutenant who will be groomed to take over after the [sic] Bob and I would leave, that is different." (Pl.'s Ex. H, emphasis added.)  Plaintiff's email seems to suggest that he would be leaving before the completion of the BT Project, although it is unclear why Plaintiff makes this insinuation.  Given the lack of

31

clarity on this issue and the fact that neither party has
addressed it, the Court declines to draw inferences from
Plaintiff's email one way or the other.

Ashworth made a similar comment on October 13, 2008, when
she announced to her group on a conference call that Plaintiff
would not be the HR Process Lead because he did not have enough
"longevity". (Pl.'s Dep. 113:5-10.) A day or two later,
Ashworth apologized to Plaintiff "for the way that the comment
came off" and explained that the BT Process Lead was expected to
stay with the company for five to seven years. (Pl.'s Dep.
84:19-85:3.)[8]

Defendants argue that Young and Ashworth were referring not
to Plaintiff's age but to the length of time an employee was
expected to remain with the company, a permissible business
consideration. The context of Young and Ashworth's comments
generally supports this interpretation. In Young's email, he
stated that he sought someone with "longevity" to show that his
team would be "accountable for the longer term impact" of the
project. Similarly, Ashworth explained her comment by noting

---

[8] Defendant argues that the Court should disregard
Ashworth's statement, because she was not involved in the hiring
decision. Plaintiff disagrees and cites Burke's testimony, in
which he stated that she was a member of the BT Steering
Committee, which discussed candidates for the HR Process Lead
position, including Plaintiff and Legg. (Burke Dep. 148:12-
150:4, Pl.'s Ex. H.) Given summary judgment posture, the Court
construes this fact in Plaintiff's favor as it must.

that the HR Process Lead was expected to stay with the company
for five to seven years.

The Court agrees with Defendants that to the extent
"longevity" refers to the length of time an employee will remain
with an employer, this is a permissible factor, which merely
correlates with age and may be considered in employment
decisions without violating the ADEA.  Hazen Paper Co. v.
Biggins, 507 U.S. 604, 608-11 (1993) (recognizing that under the
ADEA, an employer may rely on facially neutral factors that are
merely correlated with age, such as seniority or pension
status).  In Hazen, the Supreme Court explained that the purpose
of the ADEA is to prohibit discrimination where "an older
employee [is] fired because the employer believes that
productivity and competence decline with old age."  Id.  Where
an employer's decision is not based on such concerns and instead
relies on factors that are analytically distinct from age,
discrimination under the ADEA has not occurred.  Id. (employer
did not violate ADEA simply by interfering with older employee's
pension benefits that would have vested due to employee's years
of service); see also Cooney v. Union Pac. R.R. Co., 258 F.3d
731, 735 (8th Cir. 2001) ("[E]mployment decisions motivated by
factors other than age (such as salary, seniority, or retirement
eligibility), even when such factors correlate with age, do not
constitute age discrimination.").

Plaintiff does not dispute this.  Instead, he argues that
Young and Ashworth's belief about his "longevity" with the
company stemmed from their "age-stereotypical" assumption that
he would retire before completion of the BT Project.  (Pl.'s
Opp. Br. 6.)  He cites to Young and Romeo's testimony that they
believed Plaintiff was contemplating retirement.  Defendants
respond that any belief Young and Romeo may have had that
Plaintiff planned to retire was due not to his age — they note
that he was 54, 11 years younger than the typical retirement age
of 65 - but due to his behavior, sharing pictures of his Florida
vacation home.

Hazen makes clear that the ADEA "requires the employer to
ignore an employee's age" in making employment decisions.  507
U.S. at 612.  Thus, if Young and Ashworth presumed a correlation
between Plaintiff's age and his expected retirement, then their
consideration of "longevity" may have, in reality, been a mere
proxy for age, which could constitute a violation of the ADEA.
See, e.g., U.S. EEOC v. City of Indep., 471 F.3d 891, 896 (8th
Cir. 2006) ("Age discrimination may exist when an employer
terminates an employee based on a factor such as experience or
salary when the employer presupposes a correlation with age and
uses that factor as a proxy for age."); cf. Hazen Paper, 507
U.S. at 612-13 ("We do not preclude the possibility that an
employer who targets employees with a particular pension status

34

on the assumption that these employees are likely to be older thereby engages in age discrimination.  Pension status may be a proxy for age . . . in the sense that the employer may suppose a correlation between the two factors and act accordingly.").

Certain facts call into question whether Young and Ashworth impermissibly presumed Plaintiff had insufficient "longevity" simply because of his age.  First, despite showing pictures of his Florida home to Young, Plaintiff never discussed retirement plans with anyone at work.  Second, Operations VP Steve Schmitt informed Plaintiff that he was having difficulty selecting a BT Process Lead for Operations because his team members were "older".  Given Schmitt's involvement in selecting candidates for the HR Process Lead position with Ashworth and Young, and the fact that he said this a mere month after Young's comment and four days before Ashworth's comment, questions arise as to what Ashworth and Young truly meant by "longevity."  These circumstances indicate that a factual dispute exists as to what Young and Ashworth meant when they referred to "longevity".

### iii. Schmitt's "older" comment

The fourth comment cited by Plaintiff is by far the most troubling.  As just discussed, Plaintiff alleges that on October 9, 2008, Schmitt told him he was having a problem selecting an Operations Process Lead because his team members were "older." (Pl.'s Dep. 112:23-113:4; Am. Compl. ¶ 24.)  Although Plaintiff

35

testified that Schmitt's comment had no direct impact on him
(Pl.'s Dep. 113:20-114:4), Twadelle testified that he worked
with Schmitt to identify individuals who might be able to fill
the BT Process Lead "positions". (Twadelle Dep. 17:7-16).
Construing this fact in Plaintiff's favor, the Court infers that
Schmitt was involved in the hiring process for the HR Process
Lead as well.

It does not require a great leap for the Court to also
infer that Schmitt's age-bias in selecting a candidate for the
Operations position tainted his selection of candidates for the
related HR position, particularly since both positions were for
the same BT Project.

Thus, Plaintiff has proffered the following evidence to
establish an inference of age discrimination: (1) Plaintiff
hired Legg, the younger of the two viable candidates; (2) days
before Ashworth informed Plaintiff of the decision, Schmitt, a
decision-maker, commented that he was having difficulty
identifying candidates for a related position because his team
members were "older", (3) Young and Ashworth, both decision-
makers, indicated that the position required "longevity", which
Plaintiff did not possess, and (4) Defendants sought someone to
see the project through to completion, which was anticipated to
last approximately five to seven years.

The Court notes that the burden of establishing a <u>prima facie</u> case is not onerous.  <u>Texas Dept. of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 253 (1981).  Given the totality of these circumstances, a reasonable jury could infer that the Defendants' decision not to promote Plaintiff was motivated by discriminatory animus on account of his age.  He therefore has met the minimal burden of establishing a <u>prima facie</u> case, and a presumption arises that Defendants unlawfully discriminated against him.  <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 506 (1993).

### b. Legitimate, Non-Discriminatory Reason

The burden of production now shifts to Defendants to articulate a legitimate, nondiscriminatory reason for the employment decision.  <u>St. Mary's Honor</u>, 509 U.S. at 506-07.  Defendants proffer Twadelle and Young's testimony that they hired Legg instead of Plaintiff because she had significant field experience, a good understanding of the business and business processes, experience in the call center, and was deemed to have the right demeanor, professionalism, communication, and interpersonal skills.  Additionally, Twadelle testified that he had been impressed by Legg in his previous experience working with her.  Given this evidence, Defendants have satisfied their "relatively light" burden at this stage.  <u>Dunleavy v. Montville Twp.</u>, 192 F. App'x 100, 102 (3d Cir. 2006)

(citing Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994) for proposition that employer's burden at second stage is "relatively light")).

### c. Pretext

Plaintiff now carries the ultimate burden of persuading the Court that the proffered reason for the employment action is pretextual.  Burdine, 450 U.S. at 256.  If the plaintiff has produced sufficient evidence to discredit the employer's proffered reasons for the adverse action, he may survive summary judgment without citing additional evidence beyond his prima facie case.  Fuentes, 32 F.3d at 764.

To establish pretext, the plaintiff must "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes, 32 F.3d at 764 (internal citations omitted, emphasis added).  To satisfy the first Fuentes prong, Plaintiff "need not produce evidence that necessarily leads to the conclusion that the employer acted for discriminatory reasons." Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 644 (3d Cir. 1998) (internal citations omitted).  Rather, he need only "point to weaknesses, implausibilities, inconsistencies, incoherencies, or

contradictions in the employer's proffered legitimate reasons such that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the proffered nondiscriminatory reason did not actually motivate the employer's action." Id. at 644 (internal quotations and citations omitted). To satisfy the second Fuentes prong, the plaintiff need not prove that the illegitimate factor was "the sole reason" for the employment decision, but rather, that it was "a determinative factor"; that is, but for the protected characteristic, the employer would not have made the employment decision. Fuentes, 32 F.3d at 764.

Here, the evidence supporting Plaintiff's prima facie case also establishes pretext. As discussed above, just four days before Ashworth informed Plaintiff that he would not be given the HR Process Lead position because he did not have sufficient "longevity," Schmitt informed Plaintiff he was having difficulty selecting someone for the analogous Operations position because all of his team members were "older".

As discussed supra, Schmitt's comment calls into question the meaning of Young and Ashworth's ambiguous comments suggesting that Plaintiff was not qualified for the position because he did not have sufficient "longevity." While Defendants ultimately gave the position to Legg, who was only three and a half years younger, this age difference is

39

significant considering that (1) she was the younger of the two viable candidates, and (2) Defendants sought someone who would remain in the position for five to seven years.

Considering the totality of these facts, and viewing them and all reasonable inferences in Plaintiff's favor, the Court finds that Plaintiff has proffered just enough evidence to create a genuine factual dispute as to whether his age played a motivating role in this employment decision.  Defendants' motion for summary judgment on this claim is therefore denied.

### 2. HR Director Positions for Eastern Division and Customer Service Center

Defendants next argue that Plaintiff cannot establish a prima facie case of age discrimination as to the Eastern Division and Customer Service Center positions on the grounds that he never applied for them.  Plaintiff testified that Burke represented to him that he need only express an interest in these jobs and Burke would "get something done" for him, which Plaintiff took to mean that he could have either job if he wanted it.  (Pl.'s Dep. 167:4-9, 168:16-20.)  Plaintiff expressed an interest in both positions to Burke, believing based on their conversation that a formal application was unnecessary.  (Id. at 157:12-14.)  Crediting Plaintiff's account, a reasonable jury could infer that Plaintiff applied for the positions by expressing an interest in them to Burke.

40

Notably, Defendants' moving papers asserted no other grounds for summary judgment.  Nor did they assert a legitimate, nondiscriminatory reason for their employment decisions.[9] Accordingly, the Court denies Defendants' motion for summary judgment as to these claims.

### 3. Director of Employee Relations Position

Defendants also move for summary judgment on Plaintiff's claim for failing to hire him as the Director of Employee Relations, a position, which the parties agree was never created.  Plaintiff has not disputed this motion or proffered any evidence to establish his claim.  Accordingly, the Court grants Defendant's motion as to this claim.

### 4. HR Director Position for NJAW

Defendants next move for summary judgment on Plaintiff's claim concerning the NJAW position.  Defendants first argue that Plaintiff has failed to establish his prima facie case because there is no evidence that could give rise to an inference of age

---

[9] The Court notes, however, that Defendants' reply papers appear to allege a legitimate, nondiscriminatory reason for their employment decisions with respect to these positions.  Of course, Plaintiff has had no opportunity to dispute these proffered reasons as pretextual.  Accordingly, the Court rejects these arguments, which should have been raised in Defendants' moving papers.  See, e.g., Smithkline Beecham PLC v. Teva Pharma. USA, Inc., Civ. Nos. 04-0215, 05-0536, 2007 WL 1827208, *1-2 (D.N.J. June 22, 2007) ("The law is clear that reply briefs should respond to arguments raised in the opposition brief, or explain a position in the initial brief that the respondent refuted.  Reply briefs are not the time to present new argument.").

discrimination.  Defendants point out that the position was
given to Trudy Spence-Parker, who is only two and a half years
younger than Plaintiff.  Defendants further argue that even if
Plaintiff could make out a prima facie case, he has failed to
establish that their legitimate, non-discriminatory reasons for
hiring Spence-Parker were pretextual.  They contend that
Bigelow, the decision-maker, chose Spence-Parker over Plaintiff
because she was the better candidate.

Bigelow's testimony supports Defendants' contentions.
Bigelow described Spence-Parker as "clearly a superior
candidate," who performed far better in her interview than
Plaintiff.  (Bigelow Dep. 6:12, Pl.'s Ex. I.)  Bigelow testified
that Spence-Parker impressed him as someone who had the right HR
skills, strong leadership ability, dynamic personality, and was
the type of person who could successfully get the job done.
Bigelow also testified that he spoke to Mark Strauss, who was
Spence-Parker's supervisor, Burke, and John Romeo, all of whom
had very positive things to say about her.  In contrast, Bigelow
testified that he came away from his interview with Plaintiff
unimpressed, noting that Plaintiff spent most of the time
explaining why he could not accomplish things in the assignment
he was in.  (Bigelow Dep. 33:10-15.)  This testimony is
supported by an email Plaintiff sent Bigelow, in which he
attempts to explain why he described his accomplishments in the

42

interview as "limited". (Def.'s Ex. N.) Bigelow stated that he viewed this email as an indication that Plaintiff realized the interview had not gone well and that Plaintiff was "essentially sending me another note to re-explain why he couldn't get things done." (Bigelow Dep. 33:22-34:3.) Bigelow testified that prior to interviewing him, he had seen Plaintiff "in action" and had not been "overly impressed", but he decided to interview him because Burke had recommended him. (Bigelow Dep. 35:3-15.) Bigelow explained:

> I think he did his job fine, but he wasn't an individual that would aggressively pursue things. I had the impression he would do what he was told, which was fine. Those folks fit well into an organization in the right role, but it wasn't the role I was looking for.

(Id.)

Plaintiff attempts to establish a prima facie case by pointing to the following evidence. First, Plaintiff acknowledges the minimal age difference between himself and Spence-Parker but notes that Defendants selected the younger of the two candidates. As discussed above, this minimal age difference on its own does not create an inference of age discrimination sufficient to satisfy the causation prong of Plaintiff's prima facie case.

Second, Plaintiff cites to what he contends is an "inconsistency" between Burke and Bigelow's testimony regarding

the interview process.  He points to Burke's statement that
Bigelow told him his interview with Plaintiff "went very well."
(Burke Dep. 255, Pl.'s Ex. H.)  Plaintiff has plucked this
statement out of context.  Burke also testified, consistent with
Bigelow's testimony, that Bigelow told him after his interview
with both Trudy Spence-Parker and Plaintiff that he was "more
inclined to pursue Trudy," because he liked her "very upbeat
attitude" as well as the things she had accomplished in her
position as HR Director for American Water Enterprises.  (Burke
Dep. 254.)  This slight inconsistency, if there even is one, is
too minimal to create an inference of age discrimination under
the circumstances here; Burke and Bigelow themselves were in
their mid-fifties as was Spence-Parker.  <u>Reap v. Cont'l Cas.
Co.</u>, Civ. No. 99-1239, 2002 WL 1498679, *14 (D.N.J. June 28,
2002) ("Although evidence of the decisionmakers' membership in
the protected group is not dispositive on whether discrimination
occurred, the fact that the decisionmakers are members of a
plaintiff's protected class weakens any possible inference of
discrimination.").

     Third, Plaintiff points to the fact that Defendants
allegedly violated their own policy in hiring Spence-Parker,
because he was facing job elimination and was not given
"priority consideration." (Pl.'s Br. 23-24.)  Plaintiff
insinuates, without support, that "priority consideration"

required Defendants to actually give him the job, an implication
the Defendants have vigorously disputed.  In fact, it is unclear
that Burke did not give such "priority consideration" to
Plaintiff by recommending that Bigelow interview him for this
position.  Further, Plaintiff has not cited any evidence that
Bigelow even knew Plaintiff's position had been eliminated.  In
fact, Burke testified that he had not informed Bigelow of this
fact.  (Burke Dep. 255.)  Accordingly, the Court gives little
weight to this fact.

Fourth, Plaintiff attacks Bigelow's proffered reasons for
selecting Spence-Parker as a "subjective interview process."
The Court acknowledges that "[s]ubjective evaluations are more
susceptible of abuse and more likely to mask pretext." Tomasso
v. Boeing Co., 445 F.3d 702, 706 (3d Cir. 2006) (internal
quotations and citations omitted).  This argument appears
premature, however, since this principle generally comes into
play at the pretext stage, and Plaintiff has not yet established
an inference of age discrimination.  In any event, Bigelow
provided considerable detail as to why he felt Spence-Parker was
the better candidate, and Plaintiff has not disputed those
reasons.  Indeed, Plaintiff's email to Bigelow attempting to
explain why he described his accomplishments in the interview as
"limited" simply confirms Bigelow's account.

45

Finally, Plaintiff urges the Court to recognize an inference of age discrimination based on the allegedly ageist comments made during the hiring process for the HR Lead position in 2008, two years prior to the hiring for the NJAW position. Plaintiff acknowledges that the people making the comments – Young, Ashworth, and Schmitt – had no connection to the hiring for this position or to Bigelow, but he contends that these comments nevertheless show a culture of age discrimination.  It is true that a non-decision-maker's "statement about the employer's employment practices or managerial policy is relevant to show the corporate culture in which a company makes its employment decision, and may be used to build a circumstantial case of discrimination." Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326, 333-34 (3d Cir. 1995) (comment made by non-decision-maker CEO in written newsletter was evidence of managerial policy and corporate culture in which employment decision was made).  That is not the case here, however.  Young, Ashworth, and Schmitt were not referencing employment practices or managerial policy.  They were commenting on the specific needs of the BT Project and the type of candidates they sought for the Lead positions – i.e., people who would stay with the company for at least five to seven years.  In any event, these statements warrant little weight.

The factual context here does not give rise to an inference of age discrimination.  Spence-Parker, Burke, Bigelow, and Plaintiff, are all within three years of each other in age. Unlike the HR Process Lead position, Plaintiff has not proffered any additional evidence of discrimination.  Accordingly, he has failed to establish a prima facie case.  Moreover, even if he had, he has not shown that Bigelow's proffered reasons for hiring Spence-Parker are pretextual.  The Court therefore grants summary judgment on this claim.

### 5. HR Director Position for AWE

Defendants assert the same arguments with respect to the HR Director position for AWE.  They contend that since Plaintiff is only four years older than Harvilla, whom Defendants hired, he cannot establish a prima facie case of age discrimination, and even if he could, he has not discredited their nondiscriminatory reasons for the employment decision.

Plaintiff has not cited any facts to support an inference of age discrimination except the four-year age difference between himself and Harvilla.  As discussed supra, standing alone, this does not support an inference of discrimination.

Plaintiff next argues that Defendants' proffered reasons for hiring Harvilla are pretextual - i.e., because Plaintiff was the only internal candidate, he interviewed well, and he had knowledge of Six Sigma and large company experience, two of

47

several factors considered by Strauss.  To discredit the
employer's proffered reasons, however, "the plaintiff cannot
simply show that the employer's decision was wrong or mistaken,
since the factual dispute at issue is whether discriminatory
animus motivated the employer, not whether the employer is wise,
shrewd, prudent, or competent." Fuentes, 32 F.3d at 765.
Moreover, these facts hardly cast doubt on Strauss' extensive
testimony as to why he made the hiring decision.  He described
in rich detail why Harvilla was the more qualified candidate, a
point Plaintiff has not disputed. See supra Part I.  Strauss
also testified that he received negative feedback about
Plaintiff from Ashworth and ambiguous feedback from Dascani,
neither of which Plaintiff disputes.  Since Plaintiff has failed
to establish a causal connection between his age and the
decision not to promote him, the Court grants summary judgment
on this claim.

**6. HR Director for Corporate Services**

Defendants next move for summary judgment on Plaintiff's
claim regarding the Corporate Services position.  Defendants
concede that Plaintiff has made out a prima facie case of age
discrimination because they hired Melanie Kennedy for the
position, who is twenty years younger than Plaintiff.  They
argue, however, that Plaintiff has failed to discredit their
nondiscriminatory reason for hiring Kennedy.

48

Burke, the decision-maker, testified that he selected Kennedy instead of Plaintiff because the IT group was one of the key internal clients that would be supported by this position, and Burke knew that Ashworth, the Chief Information Officer, had worked with Plaintiff in the past and had not been satisfied with his support. (Burke Dep. 311:12-16.) Burke testified that during the time Plaintiff provided HR support to IT under Ashworth, she had complained to Burke three to five times about his performance, reporting that he was not engaged, delegated too much, was unresponsive to some of her needs, and was defensive. (Id. at 124:14-125:5.) Ashworth corroborated Burke's testimony. She identified several difficulties that she allegedly had with Plaintiff, including the following:

> (1)    Plaintiff and his subordinate Susan Musitano failed to deliver when tasked with the project of providing instructional classes and assisting managers with their goal-writing skills. Plaintiff and Musitano advised Ashworth that they would not be able to complete the project on time and thus Ashworth had to do the project herself, despite the fact that it was a pure HR function.

> (2)    Plaintiff did not always provide the support, clear direction, or concise answers she expected from an HR professional.

> (3)    Plaintiff did not provide sufficient guidance or direction to his subordinates, who provided advice to the IT group, which was ultimately inconsistent with the guidance Plaintiff gave once he became involved.

> (4)    Plaintiff's subordinate, Musitano, specifically articulated to Ashworth on numerous occasions that

49

she needed more guidance from and interaction with Plaintiff, and that he did not give it to her despite her specific requests.

(5)     Plaintiff failed to sensitively address an employee relations issue relating to Defendants' employees in Hershey, Pennsylvania, resulting in "quite a stir" among those employees regarding their future at the company.

(6)     Numerous other instances where Plaintiff failed to deliver or failed to provide appropriate follow-up on projects to which he was assigned.

(DSUMF ¶ 103, Pl.'s Resp. ¶ 103; Ashworth Dep. 34:9-40:13, 49:3-51:23, 60:22-63:1, 85:4-89:7.)  Ashworth also testified that she struggled with Plaintiff's communication style, including his use of sarcasm in front of her direct reports.  (Ashworth Dep. 61:1-10.)

Plaintiff argues that Ashworth never documented her dissatisfaction with Plaintiff.  The record, however, indicates otherwise.  When Plaintiff was responsible for providing HR support to Ashworth's IT group in 2008, Plaintiff received a low grade of "Progressing" from IT, which is a rating below "Meets Expectations."  (Def.'s Ex. J.)  Further, Plaintiff has not disputed any of the difficulties Ashworth allegedly had with Plaintiff or the fact that she reported these difficulties on multiple occasions to Burke.  Plaintiff also faults Burke for assuming that Ashworth would not want to work with him again, despite her repeated complaints when he had supported IT. Plaintiff's mere disagreement with how Burke should have handled

50

the hiring process, however, does not establish pretext.
Fuentes, 32 F.3d at 765.

Similarly, Plaintiff's belief that he was the more
qualified candidate for the position has little relevance here.
The inquiry is not whether the employer's decision was wrong or
mistaken, but whether "discriminatory animus motivated the
employer." Id. Plaintiff has failed to establish that Burke's
nondiscriminatory reasons for hiring Kennedy are pretextual, and
Defendant's motion for summary judgment on this claim is
therefore granted.

**7. Plaintiff's Demotion**

Defendants also move for summary judgment on Plaintiff's
claim that he was demoted on the basis of his age. They note
that it is undisputed that Plaintiff's position was eliminated,
and that most of his job duties were assumed by Jerry Crofford,
whom Plaintiff concedes is an age-peer. Plaintiff has not
disputed this motion or set forth any facts to support a prima
facie case of age discrimination. Accordingly, summary judgment
on this claim is granted.

**C. Plaintiff's Retaliation Claims**

The Court now turns to the issue of retaliation. To
establish a claim of retaliation, a plaintiff must show
that: (1) he was engaged in protected activities; (2) the
employer took an adverse employment action after or

51

contemporaneous with the employee's protected activity; and (3) a causal link exists between the protected activity and the adverse action.  Glanzman v. Metro. Mngmt. Corp., 391 F.3d 506, 508-509 (3d Cir. 2004) (citing Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279 (3d Cir. 2000)). Retaliation claims under the ADEA and NJLAD are analyzed under the familiar McDonnell Douglas burden-shifting analysis, set forth above.  Deville v. Givaudan Fragrances Corp., 419 F. App'x 201, 205 (3d Cir. 2011) (citations omitted).

    In order to establish the third prong of his prima facie case - the causal link - a plaintiff must prove that the protected activity was "a determinative factor of the employment decision," meaning that it would not have occurred but for his protected activity.  LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 232 n.8 (3d Cir. 2007), cert. den'd, 553 U.S. 1004 (2008) (citations omitted) (emphasis in original).  To do this, "a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing".  Kovac v. Pa. Turnpike Comm'n, 444 Fed. Appx. 588, 590 (3d Cir. 2011) (quoting Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d

259, 267 (3d Cir. 2007)).  Alternatively, in the absence of
these elements, "evidence of causation may be 'gleaned from
the record as a whole.'"  Id. (quoting Farrell v. Planters
Lifesavers Co., 206 F.3d 271, 281 (3d Cir. 2000)).

Notably, neither the Complaint nor Plaintiff's
opposition brief identifies his actual retaliation claims.
The Complaint simply refers to the "the foregoing acts of .
. . retaliation" and the "above-described . . . retaliatory
acts".  (Compl. ¶¶ 64, 70.)  Similarly, Plaintiff's
opposition brief refers to multiple retaliation "claims"
without identifying what they are.  Rather than engage in
an analysis of each, he asserts only broad generalities to
support these claims, despite their unique factual
circumstances.  Plaintiff has, however, provided a
"chronology" of his protected activities and the adverse
actions, which allegedly resulted from them.  (Pl.'s Br.
31-33.)  Defendant has proceeded as if these are the
retaliation claims at issue, and the Court proceeds in this
manner as well.

Defendants argue that with respect to each retaliation
claim, Plaintiff has not only failed to establish an
inference of causation to support his prima facie case, but
has also failed to show that Defendants' nondiscriminatory

reasons for the actions are pretextual.  The Court
addresses each claim in turn.

### 1. HR Process Lead

First, Plaintiff argues that within two weeks of his
complaints about age bias in October 2008, Defendants offered
the HR Process Lead position to Legg.  Putting aside the
parties' dispute over whether Plaintiff actually lodged such a
complaint, see supra Part I, Defendants rightly point out the
preposterous nature of this argument.  Plaintiff claims
Defendants retaliated against him by denying him the HR Process
position, based on his complaints about Ashworth's comment that
he had been denied the HR Process position.  According to
Plaintiff's own testimony, Ashworth informed him on October 13,
2008, that he would not be placed into the HR Process position,
because he did not have sufficient "longevity".  (Am. Compl. ¶
25; Pl.'s Dep. 113:5-10.)  Plaintiff subsequently complained
about her "longevity" comment to Romeo, Kennedy, and Burke.  See
supra Part I.  Legg's testimony also suggests that the hiring
decision was made in mid-October.  She testified that while she
received a formal offer letter on October 28, 2008 (Pl.'s Ex.
Z), Twadelle told her she got the job "probably a couple of
weeks before that."  (Legg Dep. 60:12-18, 66:22-67:1, Warden
Suppl. Decl. Ex. B.)  Since Plaintiff has failed to establish a

causal nexus between his protected activity and the alleged retaliation, this claim is dismissed.

### 2. HR Director Positions for the Eastern Division and Customer Service Center

Plaintiff also alleges that Defendants failed to hire him for the Eastern Division and Customer Service Center positions in retaliation for his complaints of age discrimination in October 2008.  Even assuming Plaintiff made these alleged complaints, Defendants did not make their hiring decisions until four months later in February 2009.  A four-month gap between the protected activity and the retaliatory action is not sufficient on its own to create an inference of causation.  See LeBoon, 503 F.3d at 233 (a gap of three months between protected activity and retaliatory action "without more, cannot create an inference of causation and defeat summary judgment").

Plaintiff has failed to set forth any other arguments as to why these hiring decisions were retaliatory.  At this juncture, the Court deems any undeveloped arguments waived.  See Conroy v. Leone, 316 F. App'x 140, 144 n.5 (3d Cir. 2009); Tsitsoulis v. Twp. of Denville, Civ. No. 07-4544, 2009 WL 5205276, *8 (D.N.J. Dec. 23, 2009). Moreover, Plaintiff has not established that the decision-makers here even knew of Plaintiff's protected activity.  Accordingly, this retaliation claim may not withstand summary judgment.

### 3. Plaintiff's Demotion

Plaintiff also contends that Defendants demoted him in retaliation for (1) his refusal to sign the Pre-Separation Agreement (the "Agreement") in January 2010, and (2) his complaints of age discrimination via counsel in February 2010. The record provides no support for these allegations.

As with his retaliation claim concerning the HR Process Lead position, Plaintiff again asserts a nonsensical argument: that he was demoted in retaliation for complaining about the Pre-Separation Agreement in January 2010, even though this agreement merely set forth the terms of the decision that <u>had already been made</u> to demote him.  In fact, Plaintiff's own testimony confirms that in December 2009, Burke informed him of the decision to eliminate his position and transition him to a lower-level post with the BT Project.  (Pl.'s Dep. 121-23.)  The Agreement merely set forth the terms of this transition and offered him certain job assurances, pay protections, and a $75,000 completion bonus in exchange for a release of discrimination claims against Defendants.  See <u>supra</u> Part I.

In fact, Plaintiff's demotion was merely consistent with Burke's stated intentions, not only in 2009, but even dating back to 2007.  Shortly after Burke was hired in 2007, he told Plaintiff he had evaluated his position and did not think it warranted the grade level at which it was classified.  (Pl.'s

56

Resp. ¶ 9; Pl.'s Dep. 41:17-44:4)  Burke reiterated to Plaintiff in subsequent conversations that his responsibilities did not justify his pay level, and he encouraged Plaintiff to seek other positions within the company.  (Id.)  Indeed, Plaintiff himself testified that he believed his position might be eliminated and that Burke had informed him to seek out other positions.  (Pl.'s Dep. 48-49.)

Because Plaintiff has failed to establish any causal link between his allegedly protected activity and his demotion, he has not satisfied his burden of proof at the prima facie stage. Accordingly, the Court grants summary judgment on this claim.

### 4. HR Director Position for NJAW

Next, Plaintiff argues that he was denied the HR Director position for NJAW in April 2010, in retaliation for not signing the Pre-Separation Agreement in January 2010 and for sending a letter to Kennedy, via counsel, complaining of "age-biased" comments in February 2010.  (Pl.'s Br. 32.)  A two-month gap between the protected activity and the adverse employment action does not, by itself, support an inference of causation.  See, e.g., McCloud v. UPS, Inc., 328 F. App'x 777, 781 (3d Cir. 2009) (one and two-month gaps between protected activity and adverse action were not "particularly suggestive" of causation); Williams v. Phila. Housing Auth. Police Dept., 380 F.3d 751, 760

57

(3d Cir. 2004), <u>cert. den'd</u>, 544 U.S. 961 (2005) (two-month gap
not "unusually suggestive").

    Plaintiff does not cite any other evidence of retaliation
with respect to this specific claim.  While he generally argues
that Defendants failed to investigate his complaints (Pl.'s Br.
37-40), he has not explained how this fact has any bearing on
the particular employment action at issue here.  He also ignores
Kennedy's undisputed testimony that after she received the
letter from Plaintiff's counsel in February 2010, she asked him
if Plaintiff wanted his allegations investigated, in light of
the fact that another client with the same counsel had not
wanted an investigation, and counsel never responded.  (Kennedy
Dep. 43:8-21, Def.'s Ex. U.)

    Plaintiff also argues that Defendants' proffered reasons
for this employment decision (and all other employment actions)
are pretextual for the reasons set forth with respect to his age
discrimination claims.  The Court rejects this argument for the
same reasons discussed <u>supra</u>.  Indeed, Plaintiff has not
proffered any evidence that the decision-maker here, Bigelow,
even knew that Plaintiff had complained of age discrimination.
Although Burke was involved in the decision and was aware of
Plaintiff's claims, there is no evidence that he relayed this
information to Bigelow or that Burke acted in any way that could

58

be construed as retaliatory.  Indeed, Burke was the one who suggested that Bigelow interview Plaintiff for the position.

Because Plaintiff has failed to proffer any evidence of retaliation other than the two-month period between his complaints and this hiring decision, he has failed to establish a prima facie case of retaliation.

### 5. HR Director Position for AWE

Plaintiff asserts the same arguments with respect to the AWE position.  (Pl.'s Br. 33.)  He contends that he was denied this position in July 2010 because he filed his Charge of Discrimination with the EEOC two months prior in May 2010.  As discussed above, a two-month gap between the protected activity and the adverse employment action does not by itself satisfy the causation prong of a prima facie retaliation case.  See, e.g., McCloud, 328 F. App'x at 781; Williams, 380 F.3d at 760.

Plaintiff again has not cited any evidence of retaliation with respect to this position.  Strauss set forth in significant detail his reasons for hiring Harvilla, including the lackluster feedback about Plaintiff from Ashworth and the ambiguous feedback from Plaintiff's former supervisor, Dascani.  As set forth above, Plaintiff has failed to discredit these reasons. Moreover, Plaintiff has not shown that the decision-maker, Strauss, even knew that Plaintiff had filed an EEOC Charge. (Strauss Dep. 89:14-15.)  In fact, the record indicates the

opposite.  Strauss testified that shortly after telling Plaintiff he had not gotten the job, he was "stunned" to find out about this litigation.  (Strauss Dep. 90, Pl.'s Ex. K.) Accordingly, summary judgment as to this claim is also granted.

### 6. HR Director Position for Corporate Services

Plaintiff asserts the same general allegations of retaliation with respect to the Corporate Services position.  He argues that Defendants hired Kennedy rather than him in retaliation for his filing of the Complaint in this action five months prior.  (Pl.'s Br. 33.)  A five-month gap, without more, does not establish causation.  See, e.g., McCloud, 328 F. App'x at 781; Williams, 380 F.3d at 760.

Again, Plaintiff has failed to cite to any evidence suggesting a retaliatory animus with respect to this specific employment decision.  As discussed supra, he has also failed to discredit Burke's proffered reasons for hiring Kennedy instead of him – notably, that the position would require him to support Ashworth, who had complained to Burke on numerous occasions about Plaintiff when he had previously provided support to her IT team.  Accordingly, the Court grants summary judgment on this claim as well.

### IV. CONCLUSION

For the foregoing reasons, the Court denies, in part, and grants, in part, Defendants' motion for summary judgment.  An appropriate Order will issue herewith.


Date:  May 25, 2012                    s/Renée Marie Bumb
                                       RENEE MARIE BUMB
                                       United States District Judge

61